MART GRIFFIN v. THE STATE.

No. 142.     Decided November 17, 1909.

**Murder—Charge of Court—Defense of Another.**

Where, upon trial for murder, the evidence showed that, while defendant and the deceased were engaged in a wordy altercation, the defendant's brother stepped up, telling the deceased that he was not game, that the deceased wheeled around to the right towards defendant's brother with a knife in his hand, and

that at that instant defendant struck deceased over the head with an axe handle, as defendant claimed, in defense of his brother, the court's failure to charge the jury on defendant's right to defend his brother was reversible error.

Appeal from the District Court of Nacogdoches.  Tried below before the Hon. James I. Perkins.

Appeal from a conviction of aggravated assault; penalty, a fine of $500 and twelve months confinement in the county jail.

The opinion states the case.

*King & King* and *Blount & Garrison,* for appellant. ·

*F. J. McCord,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—This record presents but one question for revision, to wit: the court erred in not charging the law applicable to self-defense.  The evidence is quite voluminous.  Appellant was charged with murder, and convicted of aggravated assault.

In order to present appellant's question it may be necessary to make this statement.  The record discloses that about May 1, 1907, there was a difficulty in which appellant, his brother and an uncle, I. M. Shepherd, were engaged.  During the difficulty appellant struck the deceased on the head with an axe handle which knocked him down and rendered him unconscious for a few seconds.  After the trouble deceased remained home a few days, got up and went about his business for about three months, when he was taken sick, became paralyzed and died.  The result of the autopsy revealed a blood clot upon the brain immediately under that portion of the skull where the blow was inflicted.  Physicians who testified in the case varied as to the cause of the death; some state that it was the result of the stroke, others that the lick had nothing to do with the death.  Appellant and his uncle, the deceased, had disagreed about a settlement for a certain amount of lumber that appellant had purchased from the deceased.  There had been an attempted settlement between them, and there was some contention that deceased had made appellant pay for more lumber than was right.  On the morning of the trouble the parties were all in town.  The witness Manning testified that he and deceased were standing on the sidewalk at the postoffice, from which Mr. Shepherd had just a few moments before emerged.  That the witness walked over and spoke to him, and that deceased had a circular or letter in his hand which he doubled up, tore into pieces and threw on the ground.  Witness and deceased were talking about some mill matters, that is, in regard to the condition of the market and lumber and so on, and while thus engaged appellant "came up quartering from in front of the west side of town from the direction of Toplitz's store;" when he walked up in front he said:  "Uncle, you acted the damn rascal."  The witness testified appellant "didn't

seem to be mad, seemed to be in perfect good humor. 'Why,' Mr. Shepherd says, 'May be you think so' or 'probably so' or something and I think may be Mart repeated the same thing leaving off the damn. I think he repeated the last part 'you have acted the rascal,' and Mr. Shepherd says 'go on,' and at that instant Cal Griffin (brother of appellant) walked up from behind. I don't know where he come from, he just walked up behind and says: 'Uncle, you are not game,' and Mr. Shepherd just turned around and says, 'What have I done to you, Cal?' and Cal walked up then in front and he looked like he struck at him with his left hand, just made a pass that way (witness indicates by a movement of the left hand) and at that instant Mart struck him over the head with an axe handle, kinder on the side of the head, and Mr. Shepherd fell forward. . . . Mr. Shepherd had the knife between his fingers knocking it around when Mart Griffin came up, the knife was closed. I saw the knife after Mart Griffin knocked Mr. Shepherd down. I saw it on the ground when it was picked up and it was closed. When Mr. Shepherd spoke back to Mart before the licks were struck he spoke just like I would speak to you or anybody else, he just said 'go on' or something like that; he didn't speak angrily to Mart; when he spoke to Cal he didn't seem to be mad. Cal walked up and said: 'Uncle, you are not game' and he turned around and says: 'What have I done to you, Cal?' Cal struck at Mr. Shepherd with his left hand, I couldn't see his right hand at that time. I was directly behind Mr. Shepherd, right at his back about twelve or fifteen inches directly behind him and Cal was right in front of him. I didn't see Mart doing anything when he came up and spoke to Mr. Shepherd, he didn't seem to be mad. When Mart spoke to him he was smiling, he seemed to be in perfect good humor; when Mr. Shepherd spoke it didn't seem like he was mad. I was not thinking of any trouble until the lick was passed. Mart struck him with an axe handle, an ordinary club axe handle." This witness testified for the State and places the State's case as strongly as perhaps it was stated anywhere in the testimony. This witness further testified that he could not see what Mr. Shepherd was doing with the knife at the time he turned around facing Cal Griffin. Rambin testified that he was sitting in the postoffice window when the trouble began. When he first noticed the parties appellant was standing opposite the witness in front of Shepherd kinder leaning on an axe handle talking to him (Shepherd) when Cal Griffin approached from on the side and spoke something to Shepherd. Shepherd turned to him to know what it was to him and Mart struck him. When Mr. Shepherd turned towards Cal Griffin he had a pocketknife in his hand, and as he turned he had his back to witness from where witness was sitting in the window. "As he turned to where I could see, his hands seemed, from the appearance of his hands, they seemed to be thrown together, like his hands come together, he had his knife

in one hand and they come together right in front of him. Just as he did that, just as he turned to Cal, Mart struck him. Cal was about six feet from Mr. Shepherd at that time and Mr. Shepherd fell towards Cal." Appellant testified in his own behalf. After going into some of the details in reference to the lumber transaction and ·the attempted arbitration, stated he had not seen Mr. Shepherd that morning before he went into Garrison & Langston's store where he bought him an axe handle. When · he walked out of Garrison & Langston's store Shepherd and Manning were talking, and he walked down to where they were and commenced talking to Mr. Shepherd. "I says, 'Uncle, you are not treating me right, you are not doing right,' he says 'Why,' and I says, 'You are acting the rascal with me.' As I said 'You are acting the rascal with me,' about that time Cal walked up and Uncle Ike wheeled around to the right towards Cal and caught his knife with both hands and I struck him; he had his knife in one hand and he just caught it together like that (throws both hands together). I struck him because I thought he was going to cut Cal with that knife; I thought he was going to use the knife on Cal and I struck him; I did not strike him or make any effort to strike him until after he did that. There had been no further conversation between us besides what I have stated. I struck him one time. I struck him with an axe handle. I struck him somewhere about the face. I never hit him on the side of the head or on the head either, I struck him in the face. When I struck him he fell over; after I struck him I raised the axe handle but I didn't strike him any more." Joe Garrison testified after deceased got up from where he had been knocked down he went into a drugstore, and at the point where he fell, he, witness, picked up an ordinary size pocket-knife, and it was admitted by the State that this was the knife deceased had in his hand when he was struck. Some of the witnesses testified that appellant struck at deceased another blow as he was falling. This was also denied.

We are of opinion that a charge on self-defense should have been given to the effect that if appellant reasonably believed deceased was assaulting or was about to attack his brother with a knife he would be justified in what he did. This question is properly presented and raised on the record. It will be noted that under our statute if deceased had attacked appellant when he called him a rascal or charged him with treating him badly, he could not have plead justification. It will be noted further that the witnesses for the State and appellant both testify that there was no anger on the part of appellant and deceased towards each other during the colloquy. When Cal Griffin came up and made the remark he did, which appellant ˙says he did not hear, and deceased undertook to assault him with a knife and was opening it for that purpose, or appellant believed he was opening it for that purpose, then he would have the right to defend his brother,

and the same right that his brother would have to defend. The remark that Cal Griffin made to deceased, to wit: "You are not game" would not justify or excuse deceased in making an assault. It could only be used in mitigation of any offense which deceased might commit on Cal Griffin. Then if Cal Griffin had the right to have resisted any threatened attack on the part of deceased with a knife, Mart Griffin would have equal right to do so. We are discussing this only from the appellant's standpoint; the State had another view of it under the testimony. The appellant was entitled to have his side of the issue presented to the jury in an appropriate charge. We are of opinion, therefore, that the court should have charged the jury with reference to self-defense, and because this was not done the judgment is reversed and the cause is remanded.

*Reversed and remanded.*